On the Merits.
In the year 1892 the District Judge for the District Court of Ouachita parish issued eleven orders in eleven petitory actions, which had been instituted by the Vicksburg, Shreveport & Pacific Railroad Company, in his court, directing the making of surveys of the property involved in that litigation and the making of due return to the court. The orders were granted ex parte upon the application of the plaintiff, in which it was alleged that since the filing of the suits it had had in its service competent surveyors running the lines of boundary of the lands in controversy in the causes, for the purpose of establishing the lines and ascertaining the occupancy vel non of said lands by the defendants; that while engaged in said •work the defendants conspired together to intimidate and drive plaintiffs’ employés away from the lands, and by threats and personal violence prevented the surveyor and his assistants from making the survey: that under the circumstances a survey of the land *1456 in controversy was necessary to locate the lines and ascertain the names of the occupants thereof; that there was no parish surveyor for Ouachita parish, and that it was necessary for the court to appoint some competent surveyor to make said survey and the parties should be notified.
Shortly after these orders were issued, James A. Mhoon, who had been designated therein as the surveyor to make the survey, undertook to execute the orders; but, after making a partial survey, he abandoned the work and returned to Monroe, where he had an interview with the District Judge. This interview resulted in an affidavit by Mhoon and one Howard, who had accompanied and assisted the former in bis survey, the affidavit being taken before the judge himself. In this affidavit the affiants declared that, acting under the orders above mentioned, they had on the 25th and 26th of August, 1893, proceeded to survey and mark the lines of certain real property claimed and owned by the Vicksburg, Shreveport & Pacific Railroad Company, being in the odd sections in township 16 north, range 2 east, in ward 9 in said parish, and that on the 26th of said month A. A. Armstrong, J. V. Harvey, I. J. Brooks, M. Hunnicutt and A. J. Bush, being armed and aided and assisted, advised and abetted by a large number of other persons unknown to affiants, in pursuance of their expressed purpose did then and there by force and threats resist and oppose and prevent the said J. A. Mhoon under order of said court while surveying and attempting to survey, and execute the order of said court.
The affiants in the affidavit gave a list of the various orders under which they were acting. Upon the making of this affidavit the District Judge issued a warrant signed by himself, directing the sheriff of Ouachita to arrest the said trespassers and bring them before him for preliminary examination, and to keep them safely in his custody until discharged by law, the warrant reciting that due proof had been made before the said judge by the affidavit of John T. Howard and James A. Mhoon that on the 26bh of August, 1893, the said parties did unlawfully resist by force and threats one James A. Mhoon, an officer of the Fifth Judicial District Court of said parish, in the execution of an order of survey in certain cases therein pending and to him directed by the presiding judge of said court', contrary to law in such cases made and provided.
It appears by the endorsement of the sheriff on his warrant “ that *1457 he received the same on the 28th of August, 1893, and proceeded to execute the same by arresting the parties named in said warrant, and released them on parole, they to appear béfore the judge of the Fifth Judicial District Court to undergo preliminary examination.
The parties named presented themselves shortly afterward at Monroe under their paroles for the purpose of a preliminary investigation, but in consequence of some misunderstanding as to the date of the same, the matter was postponed to a date fixed, the parties giving bond to appear at that time.
Upon the day so fixed a preliminary examination was had and evidence taken, and the District Judge being of the opinion that the testimony did not justify the holding of the parties they were discharged. Mhoon, the surveyor who had made the affidavit, was not present at this investigation, he being, it was said, at the time in another parish, confined to his room by sickness.
The District Attorney has since made no attempt to bring the matter before the grand jury, though it has been several times in session, and from his testimony it appears he has abandoned all idea of doing so in the future, stating that when a person has been discharged after a preliminary investigation he has found the effect to be so prejudicial to a subsequent prosecution before a jury, that he generally takes no further action in such cases.
The present litigation owes its origin to the facts just above stated. As a general rule, a petitory action and any incidental orders given therein would excite no special interest beyond the parties themselves. The eleven cases of which we have spoken are exceptions to this rule, for the reason that the title advanced by the plaintiffs would cover, if sustained, thousands of acres of other lands of which large portions are in the possession of others under circumstances more or less similar to, if not identical with those under which the defendants in these particular cases hold the same. The title set up by the plaintiffs is the same which was brought to our notice in the three cases of V. S. & P. R. R. Co. vs. Sledge, 41 An. 896; Kemp vs. Monet, 42 An. 1007; State vs. R. R. Co., 44 An. 981.
The various steps taken by the railroad company in the direction of the assertion of pretensions antagonistic to those of so many persons being in the same immediate neighborhood, doubtless firm in their conviction that plaintiffs’ claims are thoroughly unfounded, and sincere in the belief that their own are well grounded, have *1458 engendered, as shown by the evidence, feelings very unfriendly and hostile to the company and its agents, which have led up to active concerted extra-judicial opposition to those steps in the community in which those parties live. There is no necessity, for the purpose of this case, of our going any further back than what occurred on the occasion of Mhoou’s own survey.
The arrival of the surveying party upon the ground was immedi•ately followed by the assembling of a large number of people of the neighborhood.
Harper, one of the plaintiffs, says the object of the meeting was to see how the people could protect their rights and prevent the surveys. Bush, another of the plaintiffs, says: The people felt they had been imposed upon and they discussed together how they could protect themselves in the name of law, justice and order; and Harper, speaking of these discussions, said: “It was just the disposition of the people that the parties who represented them should go in a quiet and peaceful way or manner, without force or any manifestation of violence, tell Mr. Mhoon that it was the wish of the people that he should not make the survey.”
Precisely what was said and done at the meeting is not shown by the testimony, but it is fair to assume that the course subsequently followed conformed to the conclusions reached. Among the different accounts of what occurred, that of Hunnnicuttisthe most detailed, and as it is not very long we transcribe a portion of it. ‘ ‘ It was a Saturday, if I recollect correctly. There was a number of about twenty-five citizens went out in search of these parties making surveys, in order to request them to stop surveying the lands until they could show us and prove to us that they could give a guaranteed title with a United States seal on it, as we supposed they could not, and there was a committee of four appointed to go southeast across in the neighborhood of old man Jeff Hilton’s, and also across Mr. Campbell’s, and the committee consisted of Mr. George, Mr. Cox, Mr. Pranton and Mr. Campbell— that was the committee appointed to go down there. We were to go out by Mr. Davis’, or rather close to Mr. Davis’, to wait for these people to come from below. We went there because it was a good deal nearer, as they had been surveying in there, and we did not know where they were. Mr. Armstrong was also with us, and as we drew near Mr. Davis’ by some source, I can not say how, it was mentioned that they probably might be at Davis’ or probably go there, as it was Saturday and *1459 they would probably be going home. We decided after Mr. Armstrong went up to the house and inquired for his dogs, to wait for him until he got back. The road went to Davis’. We waited for Armstrong. While he was gone we decided we had better see what they had to say. When he came back he stated that Mr. Howard was there, and when he came back we had found them unexpectedly, and then appointed a committee consisting of Mr. Harper and Mr. Brooks to go and talk to them, and they did so. They went and stayed right smart while we wondered why they had gone and stayed so long; as it was gradually getting late along in the evening, I was sent up there to find out what they were doing. I went by myself this time. I went up there and found they were talking about matters generally, and I went back and told the people that they. were not through talking yet. They got through and came back and reported that the surveyors had said that if it was the request of the ¡people that they would not make surveys, but would go somewhere else and survey, was my understanding, and on this they appointed me and Mr. Bush to go and tell them that it was the wish of the people for them not to make any more surveys, until they could show the proper authority, that is until they could show us a deed with the United States seal on it, and we went up and delivered the message. We supposed that they agreed to go out if the people said so, and the people did agree that they wanted them to go. I never said anything to it that day. Mr. Bush said we agreed to it, and that the people wanted them to go out and stay out until they could show proper authority. They asked Mr. Brooks, whom we represented, and he said: ‘I represent the people at large.’ On their saying they would go, we turned back and went home, being very well satisfied with their agreeing not to molest us any more, as they had said they would go out. He further says that Mr. Bush said to them (the surveyors), ‘ We suppose you agree to go if the people say they wish it?’ They said: ‘ Yes, we do.’ He told them that we had reported and they sent us a committee back, and that they must go out and stay out. That this was said in a mild tone; there were, no harsh words on either side — no threats and no violence used.”
Armstrong, in his testimony, said that when, after ascertaining that Howard was at Davis’ house, he joined the body of men that Hunnicutt refers to; he found them about a quarter of a mile from Davis’, at a branch watering their horses. That there were fifteen *1460 of them, may be more; that they were all together in the road; that some were on their horses and some holding them; that he had a gun and no one else had.
Gallaway, one of the witnesses, and a chainman for the surveyors, states that the main body of men was some two hundred yards from Davis’; that returning from work on Saturday at 12 o’clock, and going to Davis’, he saw the men distinctly; that they were behind a hill; that some were standing, others sitting; that he saw several guns in the crowd, he would not say how many; that when he got to Davis’ he found two were talking to Howard; that Mhoon had a conversation with Mr. Harper; Brooks still stayed there and talked. While they wtre talking a man came up the hill, and “hollowed ” to come on and not to stay all day, and soon after these two men made off. A few minutes after, Mr. Bush and Mr. Hunnicutt rode up and told Mr. Mhoon. I suppose they were addressing him that the committee had reported, and that they did not recognize his authority and he must get out and stay out of there, and furthermore you must stay out. That the man who went up and “ hollowed ” to Mr. Harper and Mr. Brooks to come away and not stay all day had a double-barreled shotgun — he was quite sure of it.
Bush, speaking of the interview at Davis’ house, said: “Mr. Mhoon called Mr. Hunnicutt and I off, and I told him that it was the wish of the people that he quit his survey and get out and stay out;” also that “Mr. Harper told him that he represented the people; that it was their wish for him not to run the sxxrvey; that we were there as a committee to tell him to get off, and stay off, and not run the lines.” Bush, Brooks, Harper and Hunnicutt all testify that there were no threats made, nor force, nor violence used, and it is claimed by the plaintiffs that the interview between the committee and Mhoon was of a friendly character, not at all aggressive.
Mhoon himself did not take that view of the situation. His conduct and his testimony both showed that he considered it the part of prudence and discretion to at once abandon his work and return to Monroe, and this he did without delay, reporting to the judge, as has been stated.
Mhoon testified that Harper and Brooks called on him at Davis’ house; that they told him they were a committee to wait on him; that he asked Mr. Harper to step to one side; that he told him that he had been appointed by the court to go there and do some survey *1461 ing, anAj¿hy,t he wished to do it; that Harper said the people did not want Jme surveying done, and did not intend to have it done; that he, Itthoon, told Harper of his intention of going to Monroe that evening, and expected to return on Monday, and that he wanted to know if the people would let him finish the work. That at about that time some one down the road “ hollowed ” to him and asked him if he was going to stay there all night, and hollowed to him to come away; that Harper told him as he started to go off thai he would let him know what conclusion they would come to — meaning the people— and left; that in a few minutes, may be five minutes, two others came up, who, he afterward learned, were Bush and Hunnicutt. That Bush came up and remarked that they did not recognize his authority, and that he would have to get out and stay out, and that he left, went up to Monroe and reported the circumstances. He testified further that “he asked Mr. Bush whom he represented, and that he answered that he represented the whole community;” that “he quit in obedience to what he considered a very peremptory order; that he did not see any armed body of men; that the only report he heard of it was from a colored boy. That he abandoned his work and did so because he was ordered to stop the work, and he was afraid to stay there — that he was afraid of all of them; that he had good reason to believe that there were plenty to enforce their order, and he did not propose to stay there and get into any trouble, and he came away; that he did not quit from choice.”
Gallaway testified that after Bush and Hunnicutt left, “we (meaning Mhoon and others) consulted together and thought it best to take down the tent, pack up and go to Monroe, and we went on home.” He also said: “I did not consider it would have been safe to have gone back. I told Mr. Mhoon at the time that I would not go back there.”
Howard was of the same opinion as Gallaway. He testified that on his return to Monroe he reported to Mr. Lee (an agent of the defendants) that under the circumstances he would not go there any more; that he did not think it was safe to go back; that he thought it had got to the place (point) where either he or some one else would get badly hurt.
We may here say, before leaving the evidence in the case, that Harper admits in his testimony, that Mhoon told him that he was acting under order of court.
*1462 Under the state of facts disclosed by the testimony it is contended that the affidavit made against these plaintiffs, and the proceedings subsequently taken therein, were malicious, without probable cause, and greatly injurious and damaging to the plaintiffs. Their counsel urge upon us in support of their position the fact that upon the preliminary examination the District Judge, after evidence adduced, discharged the parties; they further call in question the order of survey and the action of Mhoon under it, claiming that it was ex parte; that the work was commenced prior to notice to the parties concerned; that the surveyor had not properly qualified himself by taking oath; that the surveyor had departed from the order of the court in its execution. The plaintiffs in this suit were not parties to the actions in which the orders were given, and are not in position to raise the question they attempt to raise. If there were any legal objections to the orders or the mode of their execution, even the parties themselves would not have been justified in taking the law into their own hands, but should have, through their counsel, used legal remedies which were fully open to them.
The plaintiffs were volunteers in the matter, acting either from sympathy with the defendants in their cases or from personal interests of their own in similar suits, which they anticipate would be brought against them. It is sought to have their action take the form of a mere friendly request to the surveyor to temporarily postpone action, and it is argued that though the parties were charged with armed force and resistance to the order of court, the evidence establishes that no threats were made nor violence and force applied, and therefore the charge made was groundless.
The offence which the warrant was intended to reach was obviously Sec. 785 of the Revised Statutes as amended by Act No. 11 of 1882, which declares that “ Whoever shall illegally resist, oppose or assault any officer of this State while serving or attempting to serve or execute the process, writ or order of any court, or shall assault, beat or wound any other person duly authorized while serving or executing any process, writ or order aforesaid, shall, on conviction, be imprisoned not exceeding two years, at hard labor or otherwise or fined not exceeding one thousand dollars, or both, at the discretion of the court.”
The warrant issued, as we have seen, upon an affidavit taken before the District Judge himself, who had issued the order of survey *1463 to Mhoon, after a verbal report by him to the judge of the facts and occurrences connected with the attempted execution of the orders.
A comparison of the affidavit taken by Mhoon with the facts disclosed by the testimony shows it to have been substantially and practically true. There is no doubt that Mhoon, in the work he abandoned, was acting as a surveyor under orders of the District Court, and the conclusion reached by him, that by reason of that fact he was an officer of the court, was one adopted, recognized and acted on by the District Judge. There can be no doubt that the surveyor was, while attempting to execute the orders of the court, prevented from doing so by illegal resistance and opposition, and the only remaining question is, whether the statement made in the affidavit that the parties charged did, by force and threats, prevent the execution of the order, was justified and authorized to be made.
In the first place affiants are not to be held as rigidly bound by the exact terms used by them in an affidavit, as is the State by those in an indictment, particularly when the affidavit is' taken before and scrutinized before being made by a District Judge learned in the law. In the next place the particular words “ force ” and “threats” as used and employed in affidavits and indictments, have not precisely the same scope as when used in ordinary conversation. The words “force and arms” are frequently used when they really add nothing to an indictment. It is a mistake, however, to suppose that in order to constitute force it is always necessary that actual active physical force be applied, or that to constitute “ threats” violent language be employed. Any conduct, in the connection we are now dealing with the word, which would place the officer executing the process of the court in bodily fear or terror is “that force ” contemplated by the law, while “threats” may be communicated by signs or by actions as fully and thoroughly as by word of mouth.
We do not question the testimony of the plaintiffs which declares that no violence was used and no threats were made, when we refer that language to actual force or spoken threats. We think, on the contrary, that the very object of the meeting preceding the interview with Mhoon, was to formulate a plan by which threats could be made to be implied and force to be foreshadowed, without bringing the parties resorting to the methods within the range of the criminal statutes of the State. No one reading the testimony in this record can fail to see that the parties who called upon Mhoon did so with *1464 the determination through their actions, and doubtless by the tones of voice of their committeemen sent to him, to impress him, as in fact they did impress him and his party, that they would be in great danger of bodily harm by further prosecution of their work.
It is not customary to make requests in the language used on the occasion of the interview through committeemen, with a body of men near by within supporting distance. It will not do to say for the purposes of this suit, that the display of men (to a certain extent masked) was a mere sham demonstration, and the appearance of one single armed person on the hill an insignificant circumstance. One single armed man would convey to the surveyors, as it was probably intended to convey, the impression that others were also armed, and could as effectually bring about a cessation of the work as the actual fact of the whole party being armed. The surveying party acted on belief and on appearances, and the facts were such as to reasonably bring about the belief.
We are of the opinion that the course taken by these five plaintiffs brought them within the reach of legal punishment. The District Judge thought them at first blush amenable to the statute cited, instead of liable to arrest and punishment for a contempt of his court. We are not called on here to say whether or not, under an indictment under Sec. 785 of the Revised Statutes, they could have been legally convicted; that is not the question before us. Mhoon and Howard made known the facts, and under a justifiable affidavit the District Judge himself designated the charge. If there was any mistake in affixing to plaintiffs’ conduct its legal character, they were not to blame for it, or for a change of opinion by him later on. The conclusions we have reached do away with the necessity of our determining whether or not the defendants would have been legally responsible in the premises had there been really a malicious prosecution of plaintiffs, but it may not be amiss to say that defendants, by its pleadings, would have settled that question for this case. Not content with pleading the general issue they have adopted the action of Mhoon and justified under it, and in their application for a new trial they pressed upon the court that the testimony conclusively showed that they had good grounds for believing the plaintiffs criminal as charged in the affidavit.
The plaintiffs, on the other hand, by their pleadings, admit their participation in the acts complained of in the affidavit, but claimed *1465 that their acts were not of the character sworn to. The evidence does away with this claim, and, outside of the pleading's, we are satisfied that plaintiffs’ conduct was such as to protect the parties who took the affidavit, or the defendant corporation from the present action.
For the reasons herein assigned it is ordered, adjudged and decreed that the verdict of the jury he set aside, and the judgment thereon rendered be annulled, avoided and reversed, and it is now ordered, adjudged and decreed that there be judgment in favor of the defendants, against the plaintiffs, rejecting their demand with costs in both courts.
Rehearing refused.